**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF MISSISSIPPI
GREENVILLE DIVISION**

**THOMAS BURRELL**                                                                                    **PLAINTIFF**

**V.**                                                                                             **NO. 4:17-CV-170-DMB**

**ANGELA WELTING, Personal
Representative and Executrix of the
Estate of Wayne M. Carlisle; and
DEER CREEK FARM, INC.**                                                                       **DEFENDANTS**

**OPINION AND ORDER**

After a jury awarded Angela Welting $1,092,500 on her breach of contract claim against Thomas Burrell, Burrell filed a motion for a new trial or remittitur. Because the Court finds the trial evidence is not sufficient to support the amount of the jury verdict, Burrell's motion will be granted and Welting will be given the option of either accepting a remitted award or proceeding with a new trial as to damages.

**I
Procedural History**

On December 4, 2017, Thomas Burrell filed a complaint in the United States District Court for the Northern District of Mississippi against Wayne Carlisle, Wayne Carlisle Farms, and Deer Creek Farms, Inc.[1] Doc. #1. On January 11, 2018, Burrell filed an amended complaint against the same defendants. Doc. #2. The amended complaint concerns Burrell's sublease of three tracts of farmland—including land owned by Deer Creek Farm and leased to Carlisle ("Deer Creek property")—and alleges claims for breach of contract, tortious breach of contract, intentional misrepresentation/fraud, promissory estoppel/equitable estoppel/detrimental reliance, civil

---

[1] The initial complaint identified this entity as "Deere Creek Farms, Inc." which the amended complaint corrected to "Deer Creek Farm, Inc."

conspiracy, tortious interference with contractual relations, and race discrimination pursuant to 42 U.S.C. § 1981. *Id.* at 11–18.

On February 6, 2018, Carlisle filed an answer to the amended complaint which included counterclaims against Burrell for breach of contract, costs of enforcement, trespass, and fraud. Doc. #4. Eight days later, Deer Creek filed an answer to the amended complaint. Doc. #10.

Following Carlisle's death on January 5, 2019,[2] on Burrell's motion,[3] "Angela Welting, Personal Representative and Executrix of the Estate of Wayne M. Carlisle" was "substituted as the proper party defendant in place of" Carlisle and Wayne Carlisle Farms. Doc. #102.

Burrell's claims and Welting's counterclaims were tried before a jury December 6–10, 2021. Doc. #182. During trial, Burrell withdrew his race discrimination claims; "his claims for breach of contract, tortious breach of contract, intentional misrepresentation/fraud, and promissory estoppel/equitable estoppel/detrimental reliance against Deer Creek Farm; and his fraud claim against Welting." Doc. #181. Welting also withdrew her fraud counterclaim at trial. *Id.*

At the close of Burrell's case-in-chief, both Welting and Deer Creek orally moved for judgment as a matter of law on the claims remaining against them. *See* Doc. #182. The Court granted Deer Creek's motion on all claims; and granted Welting's motion on the claims for civil conspiracy, breach of contract and tortious breach of contract with respect to the Deer Creek property, and punitive damages. Doc. #191. Welting then presented her case. *See* Doc. #182. At the close of all evidence, Burrell moved for judgment as a matter of law on Welting's trespass claim and Welting renewed her motion for judgment as a matter of law. The Court denied both motions and sent the case to the jury. Doc. #191. The jury found for Welting on all claims and

---

[2] Doc. #86.
[3] Doc. #93.

awarded her $1,092,500 in damages for breach of contract as to the Deer Creek property and no damages on the trespass claim. Doc. #190.

On December 20, 2021, Burrell filed "Plaintiff's Motion for a New Trial Pursuant to Fed R. Civ. P 59 and/or Remittitur." Doc. #193. The motion is fully briefed. Docs. #194, #207, #210.[4]

## II
## Standard

Federal Rule of Civil Procedure 59(a) provides that a "court may, on motion, grant a new trial on all or some of the issues—and to any party—… after a jury trial, for any reason for which a new trial has heretofore been granted in an action at law in federal court." Fed. R. Civ. P. 59(a)(1)(A). "Motions for a new trial … must clearly establish either a manifest error of law or fact or must present newly discovered evidence." *Naquin v. Elevating Boats, L.L.C.*, 817 F.3d 235, 240 n.4 (5th Cir. 2016). In this regard, "[a] trial court should not grant a new trial on evidentiary grounds unless the verdict is against the great weight of the evidence." *Seibert v. Jackson Cnty.*, 851 F.3d 430, 439 (5th Cir. 2017).

## III
## Relevant Trial Evidence[5]

John William Mayton, who manages the Deer Creek property on behalf of Deer Creek Farms,[6] testified that he leased the Deer Creek property to Wayne Carlisle after reaching an agreement with him in early January 2017.[7] Doc. #200 at 498. Under that lease, Carlisle was

---

[4] Burrell filed a motion to amend his rebuttal brief to correct the inclusion of the Mississippi state lands in his calculations of potential damages. Doc. #213. The Court denied the motion. Doc. #219. The Court nevertheless recognizes that only the Deer Creek property is at issue in Welting's breach of contract claim and that only damages related to that property should be considered.

[5] Although multiple claims were at issue during trial, Burrell challenges the verdict only with respect to Welting's breach of contract claim against him for the Deer Creek lease. Accordingly, only facts relevant to that claim are set forth here.

[6] *See* Doc. #200 at 496, 552.

[7] The lease itself indicates it was between Deer Creek Farm, Inc. and Carlisle Farm. Ex. P-9.

3

required to pay $125,000 in rent "due … January 15th of each crop year." *See* Ex. P-9; Ex. D-9. Mayton had worked with Carlisle for approximately ten years prior to this agreement. Doc. #200 at 498.

Burrell testified that he has "been farming off and on at some level for the last 50 years." Doc. #198 at 32. In January 2017, Burrell negotiated with Carlisle to lease three tracts of land from him, including the Deer Creek property. *Id.* at 34–35. On January 19, 2017, Tyrone Grayer and Burrell "d/b/a International Trustee Group LLC," as lessees, signed a written lease agreement with Carlisle as to the Deer Creek property. *Id.* at 66; *see* Ex. P-1. The lease provided for a term of five years with "[r]ent … due and payable $188,500.00 January 1 of each crop year." Doc. #198 at 45; *see* Ex. P-1. The lease also provided for one percent interest per month if a rental payment was missed. Doc. #200 at 433–34; *see* Ex. P-1. An "Amendment to Lease Contract" signed by the same parties on the same date as the lease provided that the lessees would "put $50,000 into the farm to improve the farm" and if they failed to do so, they were required to pay an extra $50,000, making the total rent $238,500. *See* Ex. P-1; Doc. #199 at 145–46.

According to Burrell, after signing the lease, he "started to perform the improvement of the land that [was] required." Doc. #199 at 154. This included cleaning out ditches, improving irrigation pumps already on the property, fertilizing the land, and preparing the soil to plant. *Id.*

In April 2017, Mayton asked Carlisle "where we were on the rent" which Carlisle owed him under Carlisle's lease of the Deer Creek property. Doc. #200 at 502. Carlisle then demanded that Burrell pay the 2017 rent and notified him that "[d]ue to failure to pay rent [t]his lease will be terminated immediately." Doc. #199 at 142; *see* Ex. P-5. Carlisle initiated eviction proceedings and on June 27, 2017, the Justice Court of Sunflower County, Mississippi, entered a "Judgment of Eviction of Agricultural Tenant" against Burrell, Grayer, and International Trustee Group "for

4

failing to pay rent." Doc. #199 at 313–14; *see* Ex. D-6. The Sunflower County Circuit Court affirmed the eviction on May 24, 2018. Doc. #199 at 316–17; *see* Ex. D-18. Burrell understood that he was to leave the property following the order but did not vacate the property. Doc. #199 at 314.

After finding out he was going to be evicted, Burrell filed bankruptcy in July 2017. Doc. #199 at 205, 328. At some point in 2017, Burrell planted a wheat crop on the Deer Creek property and maintained possession until May 2018.[8] Doc. #199 at 323; Doc. #200 at 454. Burrell testified that he offered the wheat crop to Carlisle to satisfy his rent obligation but Carlisle refused. Doc. #201 at 709. On January 29, 2018, the bankruptcy judge "dismissed the [bankruptcy] case because … [Burrell] did not qualify as a … family farmer." Doc. #199 at 324; Ex. D-19. After Burrell left the property, Carlisle harvested the wheat crop. Doc. #200 at 455.

According to Welting, the crop "wasn't worth harvesting" and Carlisle wanted "to plow it under" but was forced to harvest it so that it would not rot. Doc. #201 at 687–88. When comparing what Carlisle received for the crop to his expenses in harvesting it, Welting testified "it was … a wash" because Carlisle did not make any profit. *Id.* at 688. Specifically, "a little over $87,000 were the proceeds from that wheat crop" and Carlisle paid "over $62,000 … for fertilizer, for application of the fertilizer, for harvesting, and hauling the grain to the elevator on top of $22,000 rent that had to be paid." *Id.* at 703. Additionally, Welting testified Carlisle lost time on planting his own soybean crop. *Id.* However, Burrell disagreed with Welting's assessment, testifying that the wheat was "one of the best varieties" and "should have produced at least 80 bushels to the acre," making it worth approximately the $291,000 it was insured for. Doc. #201 at 721.

---

[8] Burrell later testified that he could not farm the Deer Creek property at any time in 2018 and that he left the property in March 2018. Doc. #201 at 710. Welting testified that Burrell maintained possession until June 2018. Doc. #201 at 680, 685.

Burrell did not pay any rent to Carlisle for the Deer Creek property. Doc. #200 at 414. Welting testified that the rent Burrell owed Carlisle for 2017 totaled $188,500; the interest for the unpaid 2017 rent totaled $150,500; the rent for 2018 was also $188,500; and Burrell never paid rent for either 2017 or 2018. *Id.* at 675–77. After Carlisle died, Welting paid Deer Creek the rent for 2017 and 2018, for a total of $350,000. Doc. #200 at 566–68; Doc. #201 at 657.

Burrell, Mayton, and Welting all testified about Carlisle's physical and medical condition during the relevant time. Mayton testified that when he saw Carlisle in January 2017, Carlisle's health was "rapidly declining;" his "memory was fading;" he was "having difficulty moving around;" and he had a "gray look in his face." Doc. #200 at 554; Doc. #201 at 660. When Mayton saw Carlisle in the spring of 2018, he "didn't recognize him" because Carlisle "was in a wheelchair, and he was fading fast." Doc. #200 at 555; Doc. #302 at 661.

Welting testified that towards the end of his life, Carlisle "was in very poor health," including suffering from diabetes that caused him to lose vision in one eye. Doc. #201 at 673–74. In 2017, he "was no longer able to get in and out of his pickup without being helped" and "[h]is kidneys started failing, and he was placed on dialysis." *Id.* He also "had congestive heart failure" resulting in swelling in his legs. *Id.* at 674. According to Welting, these health problems greatly hindered Carlisle's ability to farm. *Id.*

Burrell testified that when they were negotiating the leases, Carlisle was able to drive his truck and while Carlisle "indicated that he had a problem with one of his eyes" and "acknowledged that he was a diabetic," Burrell did not observe "any conditions that would prevent him from moving." Doc. #201 at 707.

When asked about the "effects [she witnessed] of the stress of these leases and this situation involving Mr. Burrell upon [her] father," Welting testified that "[i]t just about killed him;" he "was

6

under so much stress and worry. He suffered a stroke. He was paralyzed on his left side. … [H]e was totally bedridden." Doc. #201 at 689. Welting testified that after Burrell vacated the Deer Creek property, Carlisle planted a soybean crop and "pushed himself" to farm it so that he could pay his rent to Deer Creek.[9] *Id.* However, Welting admitted she is "not a physician" and is only "qualified to observe the changes that [she] saw in him every day." Doc. #201 at 691.

## IV
## Analysis

Burrell argues a new trial is warranted because the damages award "is unsupported by the evidence, excessive, and otherwise improper in light of controlling law as to available breach of contract damages" and "prejudicial and improper comments during [Welting's] closing arguments acted so as to impugn the court while imposing significant prejudice." Doc. #194 at 1. Alternatively, Burrell seeks remittitur. *Id.*

### A. Amount of Damages

Burrell argues he did not owe any rent after he vacated the Deer Creek property such that "economic losses could only be rightfully determined to be far less than $1,000,000.00" and any award for emotional distress damages is unsupported because Welting's testimony regarding Carlisle's emotional distress was "based on observations and generalities," there is nothing to link Carlisle's "physical problems to the breach of contract with any requisite specificity," Welting's "lay opinions regarding causation of complex medical conditions" is insufficient, and there was no testimony to "separate emotional distress from [Carlisle's] unrelated physical conditions." *Id.* at 2–3, 5–6. Welting responds that (1) there "is no evidence … that the jury's award to [her] was emotional distress damages" because "[g]iven the verdict form and jury instructions, the jury could

---

[9] Welting also testified that at the same time, her mother was diagnosed with cancer. Doc. #201 at 689.

have awarded economic or noneconomic damages;" (2) "to the extent that Burrell's claim rest [sic] on the fact that actual economic losses and noneconomic damages should have been separated on the verdict form, he waived that issue by failing to object at trial;" and (3) even if the verdict included noneconomic damages, she "presented sufficient evidence to support an award of emotional distress damages." Doc. #207 at 10. Burrell replies that "[r]egardless of whether or not the jointly agreed Verdict Form did not separate economic vs. noneconomic losses, it is clear that economic losses could not have risen nearly to the level of the verdict." Doc. #210 at 3.

Welting is correct that "neither [she], this Court, nor Burrell knows how [the jury] allocated … damages"[10] because the verdict form—agreed to by both parties—awarded a general verdict as to damages.[11] *See* Doc. #190; Doc. #202 at 815–16. However, the Court must still determine whether that general award "is against the great weight of the evidence" such that a new trial would be warranted. *Seibert*, 851 F.3d at 439.

Based on the Sunflower County ruling in the eviction case, in deciding Welting's oral motion for judgment as a matter of law, this Court found Burrell had breached the contract as to the Deer Creek property. Doc. #201 at 642–43. Accordingly, the Court instructed the jury that if it found by a preponderance of the evidence that "Angela Welting suffered damages as a proximate result of … Burrell's breach, she [was] entitled to a verdict in an amount which will reasonably compensate her for the loss sustained." Doc. #188 at PageID 1419. Elsewhere in the instructions, the Court explained that "[s]uch damages are called compensatory or actual damages and are

---

[10] Doc. #207 at 12–13.

[11] *See Wellogix, Inc. v. Accenture, L.L.P.*, 716 F.3d 867, 878 (5th Cir. 2013) (defendant not entitled to a new trial based on argument that "it [was] impossible to know whether the jury improperly relied on" certain evidence where the defendant failed to request a special verdict or answers to questions or raise "any pertinent objection to the jury submission and charge").

awarded for the purpose of making the injured party whole again insofar as a money verdict can accomplish that purpose." *Id.* at PageID 1410.

The trial evidence shows that yearly rent under the lease was $188,500; an additional $50,000 was due if improvements were not made;[12] Burrell occupied the Deer Creek property for all of 2017; Burrell never paid any rent for the property; the lease provided for 1% interest on late payments; and the interest on the 2017 rent totaled $150,500. Thus, there is evidence to support damages of $389,000.[13] Additionally, there is no dispute that Burrell occupied the property for some portion of 2018. Because the lease provides that rent is due "January 1 of each crop year,"[14] there was also evidence for the jury to reasonably conclude that Burrell was required to pay another $188,500 in rent for 2018, bringing the total possible economic damages to $577,500.[15] Thus, the question becomes whether the trial evidence supports the award of an additional $515,000.[16]

With respect to noneconomic damages, the Court instructed the jury:

> "Noneconomic damages" means subjective, nonpecuniary damages arising from pain, suffering, inconvenience, mental anguish, worry, emotional distress, injury to reputation, humiliation, embarrassment, loss of enjoyment of life, hedonic damages, other nonpecuniary damages, and any other theory of damages such as fear of loss, illness or injury. The term "noneconomic damages" does not include punitive or exemplary damages.

Doc. #188 at PageID 1414.

Under Mississippi law,

> Plaintiffs may recover emotional distress damages for breach of contract in the absence of a finding of a separate independent intentional tort. To do so, they must

---

[12] Although Burrell testified about improvements he made to the land, he did not provide any documentary evidence supporting those improvements so the jury was not required to believe his testimony.

[13] $188,500 + $50,000 + $150,500 = $389,000. In closing arguments, Welting's counsel specifically asked for "damages including the back rent and the interest in the amount of $339,056.56." Doc. #202 at 849.

[14] Ex. P-1.

[15] $389,000 + $188,500 = $577,500.

[16] $1,092,500 (jury verdict) - $577,000 = $515,000.

> show that mental anguish was a foreseeable consequence of the breach and that they actually suffered mental anguish. Plaintiffs may recover such damages without proof of a physical manifestation, and expert testimony showing actual harm is not always required, but generalizations such as "it made me feel bad" or "it upset me" are not sufficient. Instead, a plaintiff must show specific suffering during a specific time frame.

*Rutter v. Conseco Life Ins. Co.*, No. 3:09-cv-680, 2013 WL 75074, at *5 (S.D. Miss. Jan. 4, 2013) (cleaned up) (citing *Univ. of S. Miss. v. Williams*, 891 So. 2d 160, 172 (Miss. 2004)).

As Welting points out,[17] Burrell does not argue that mental anguish was not a foreseeable consequence of the breach but rather challenges whether there is sufficient evidence that Carlisle suffered emotional distress as a result of the breach. Burrell testified that Carlisle suffered from diabetes and a loss of vision in one eye prior to entering into the leases.[18] *See* Doc. #201 at 707. Welting and Mayton testified that Carlisle's health continued to decline over the course of events surrounding the lease, including suffering a stroke that left him partially paralyzed. Doc. #200 at 554–55; Doc. #201 at 660–61, 673–74, 689. According to Welting, these medical conditions hindered Carlisle's ability to farm because he was not able to drive, struggled to get in and out of his truck, and could not operate farm equipment. Doc. #201 at 674. Welting also testified that Carlisle was "under so much stress and worry" and despite his medical conditions, he "had to keep going," planting the soybean crop and farming by phone to raise the funds to pay the rent he owed Deer Creek. Doc. #201 at 689–90.

While Welting testified about her observations of Carlisle's medical conditions and her belief they made it more difficult for him to farm in order to pay rent to Mayton after Burrell's breach, she "failed to present evidence of any physical manifestations … of the emotional distress"

---

[17] Doc. #207 at 15.

[18] While Burrell is correct that Welting did not provide expert testimony linking Carlisle's medical conditions to the breach, the testimony can reasonably be viewed as providing a foundation to show Carlisle's condition before the breach occurred.

she claimed Carlisle suffered as a result of Burrell's breach.[19] *Parsons v. Walters*, 297 So. 3d 250, 260–61 (Miss. 2020) (insufficient evidence to support emotional distress award of $350,000 where the only evidence was plaintiff's own testimony that she suffered "sleepless nights due to stress"). Nor did Welting introduce evidence showing "specific suffering [by Carlisle] during a specific time frame." *Rutter*, 2020 WL 75074, at *5; *see Wilty v. Alpha*, 99 So. 3d 830, 836 (Miss. Ct. App. 2012) (insufficient evidence to support wife's emotional distress award based on testimony of husband and wife where "[t]here were no specific examples, specific time frames, or specific details of suffering[, n]o one testified how being really unhappy and depressed affected [wife's] life or those around her[, n]o testimony reflected how her depression manifested itself[, and t]he jury was not given the specific date she visited the psychiatrist nor any record of that visit"). And since Welting's "generalizations … are not sufficient,"[20] her testimony that Carlisle was "under so much stress and worry" that it "just about killed him" is insufficient to support an emotional distress award.[21] *Parsons*, 297 So. 3d at 261–62 (plaintiff's testimony regarding "the stress and anxiety of trying to determine how he could make ends meet without the money" defendant owed him was insufficient to support emotional distress award).

Because Welting's testimony is insufficient to support the damages award over the $577,500 in economic damages, the jury verdict was against the great weight of the evidence. Accordingly, a new trial on damages[22] is warranted. *Matter of 3 Star Prop., L.L.C.*, 6 F.4th 595, 614 (5th Cir. 2021).

---

[19] While Mayton and Burrell also testified about their observations of Carlisle's health, nothing in their testimony linked what they observed to the breach.

[20] *Rutter*, 2020 WL 75074, at *5.

[21] Even if Welting's testimony was sufficient to justify an emotional distress award, "such a large recovery is not warranted" "based solely on the plaintiff's own speculation, assertion or self-diagnosis." *Parsons*, 297 So. 3d at 262.

[22] Burrell argues a new trial on "liability and damages" is warranted. Doc. #194 at 1. However, Burrell's liability on Welting's breach of contract claim was determined by the Court's ruling that the Sunflower County eviction order

11

## B. Prejudicial Comments

Burrell asserts that "[d]uring closing argument, counsel for [Welting] impugned the Court, invading the province of the Court by telling the Jury that the Judge should have granted a particular jury instruction" addressing Burrell's duty to repudiate a contract. Doc. #194 at 8. He argues this "clear and obvious attempt to improperly influence the Jury was intentional and extremely misleading" and "seriously affected the fairness, integrity, and public reputation of the judicial system." *Id.* Welting responds that because "Burrell did not object to [Welting's] closing argument …, he is barred from asserting this issue in [his] Motion for a New Trial,"[23] and the "closing argument was not prejudicial to the jury and properly instructed them on the law." Doc. #207 at 10. Noting that he "did not have the benefit of the trial transcript" when he filed his motion, Burrell admits "that the prejudicial comments do not appear to be in the transcript."[24] Doc. #210 at 2. Accordingly, he "cannot presently argue that they were made or should support the granting of any relief." *Id.*

The Court agrees that Burrell's failure to object during closing arguments amounts to a waiver of this issue. Further, the Court's review of the transcript does not reveal any improper or prejudicial comments by Welting's counsel. Thus, this argument is without merit.

---

determined he breached the contract and Burrell does not present any argument challenging that ruling. Accordingly, a new trial as to liability is not warranted.

[23] Burrell states that his counsel "did object because the statements were made while Counsel was turned away." Doc. #210 at 2. However, the only objection during closing arguments addressed Welting's counsel's use of the term "victim" with reference to Grayer. Doc. #202 at 848.

[24] Burrell asserts that "the Court Reporter may not have transcribed this information accurately, though [his counsel] is certainly open to the fact that he might have been mistaken about the comments." Doc. #210 at 2. He requests that the Court "allow review of any audio recording of the closing arguments so as to determine whether such prejudicial comments were in fact made and not transcribed" and that the parties "be allowed to further address this whether by oral argument or otherwise to assure that the record is accurate." *Id.* But Burrell has not presented any evidence that the transcript does not accurately reflect the events of trial.

### C. Combined Effect

Burrell argues that the "combined effect" of the large verdict and prejudicial closing argument warrants a new trial. Doc. #194 at 9. However, since Burrell failed to object to the alleged "prejudicial" comments and because the transcript does not reflect that such arguments were made, this argument is without merit.

### D. Remittitur

Burrell argues "a remittitur is warranted considering the bias, prejudice, and passion that influenced the Jury" and because "the damages award was contrary to the overwhelming weight of credible evidence when applying the requisite legal standard." Doc. #194 at 10. Burrell relies on his arguments in support of a new trial in his argument for remittitur. *Id.* ("For the above and foregoing reasons, explained in all sections of this Brief …."). Welting responds that Burrell "has made no showing and produced no evidence as to why he believes the verdict was excessive." Doc. #207 at 23.

> A remittitur is an order awarding a new trial, or a damages amount lower than that awarded by the jury, and requiring the plaintiff to choose between those alternatives. Thus, before a court may order a remittitur, it must first determine that a new trial is warranted. Except in those cases where it is apparent as a matter of law that certain identifiable sums included in the verdict should not have been there, the court may not reduce the amount of damages without giving the plaintiff the choice of a new trial, for to do so would deprive the parties of their constitutional right to a jury.

*Foradori v. Harris*, 523 F.3d 477, 503 (5th Cir. 2008).

Here, the Court has already found that a new trial as to damages is warranted because the $1,092,500 award is against the great weight of the evidence and that the evidence supports an award of $577,500. Accordingly, Welting will be given the choice of accepting a remitted total award of $577,500 or proceeding with a new trial as to damages.

13

V
Conclusion

Burrell's motion for a new trial and/or remittitur [193] is **GRANTED**. Welting is **DIRECTED** to notify the Court no later than October 3, 2022, whether she accepts the Court's remitted damages award of $577,500. If Welting does not accept the remittitur, a new trial on damages will be set.

**SO ORDERED**, this 19th day of September, 2022.

/s/Debra M. Brown
**UNITED STATES DISTRICT JUDGE**

14